# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DEBBIE S. RAINWATER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-CV-486-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER AND OPINION</u>

Claimant, Debbie S. Rainwater ("Rainwater"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Rainwater appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Rainwater was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Rainwater was 43 years old at the time of the hearings before the ALJ on April 10, 2008 and August 19, 2008. (R. 356). She had completed the tenth grade of high school. (R. 360). She lived with her family in the home of her brother. (R. 356-57, 365).

Rainwater testified she could not work due to symptoms from breathing problems, pain, and mental problems, including depression, anxiety, and lack of concentration. (R. 363, 369, 373, 395). She said that her overall health deteriorated since diagnosis of pulmonary lymphoma in 2003. (R. 363, 369). She felt as if she were unable to breathe, and as though her lungs were failing. (R. 363, 369, 392-93). Rainwater testified that she used breathing treatments three times a day and used an inhaler for symptoms of dyspnea. (R. 363, 371). A pulmonary function test reported normal readings. (R. 370-71).

Lymphoma caused a painful paraspinal mass to grow in Rainwater's neck. (R. 369-70, 394-95). The lymphoma also caused skin spots and painful skin ulcers. (R. 390, 393-94). When Rainwater's medical insurance ended in 1998 she went without treatment due to lack of money. (R. 358, 376, 379). She applied for clinical research studies and financial assistance for prescription medications. (R. 378, 392). In early 2008 Rainwater was accepted into the University of Oklahoma's dermatology program for a clinical trial use of nitrogen mustard chemo. (R. 369, 376-378). Rainwater felt overall the nitrogen mustard helped her cancer, though the skin spots were exacerbated on initial treatment. (R. 370, 376-78).

Rainwater reported that her physical activities declined when her health deteriorated. (R. 363, 373). She experienced symptoms of fatigue that left her with no energy, and she felt "weak all the time." (R. 373). The day of the hearing was the first day in a long time that she had put on makeup or done her hair. (R. 363). A typical day for Rainwater consisted of watching television, cooking, cleaning, and doing household laundry. (R. 364-66). She also helped take care of her 3-year-old grandson. *Id.* Rainwater testified that she tried to accompany her husband on grocery shopping trips but "went to the car." (R. 367).

Rainwater experienced difficulty with depression and anxiety. (R. 373-74, 392, 395).

2

She said that she felt like she lived in a hole and had no control of her life. (R. 395). She had difficulty keeping a train of thought. *Id.* As an example, she reported she had gone to the wrong apartment on three occasions. *Id.*

Rainwater smoked since she was eighteen. (R. 363, 367-69, 376). Rainwater testified that she had quit smoking a month before the April 2008 hearing. (R. 363, 394).

Rainwater arrived at Tulsa Regional Medical Center Emergency Department ("TRMC ER") on June 14, 2002, with complaints of severe upper back pain, shortness of breath with wheezing, and productive cough. (R. 269-70). She had one occasion of coughing red sputum. *Id.* Hospital notes reflect that Rainwater left without being seen by a doctor. *Id.*

Rainwater was seen at Oklahoma State University's Medical Clinic ("OSU Medical Clinic") on September 9, 2002 for follow-up from hospital stay. (R. 180-82). Rainwater's recorded breath peak flow measure was 200. *Id.* Chest x-rays showed that she had left upper lobe atelectasis.[1] (R. 182).

On November 19, 2002, Rainwater presented to the TRMC ER for shortness of breath, coughing, wheezing, and chest discomfort. (R. 262-68). She reported she became very short of breath when walking. (R. 266). Rainwater was observed to have deep and labored breathing. (R. 264). Results of CT chest scans and x-rays were normal. (R. 265). Doctors concluded that Rainwater suffered acute exacerbation of chronic obstructive pulmonary disease ("COPD"). *Id.* She was prescribed prednisone and antibiotics. *Id.* Rainwater insisted on being discharged when she improved after medication and breathing treatments. (R. 265). Discharge notes reflect that she continued to experience dyspnea when talking as she left by wheelchair. (R. 266).

---

[1] Atelectasis is defined as: "[a] collapsed or airless condition of the lung." Taber's Cyclopedic Medical Dictionary 167 (17th ed. 1993).

Rainwater returned to TRMC ER on November 22, 2002 with continued moderate shortness of breath, coughing, and wheeze. (R. 257-61). Chest x-rays were unremarkable. *Id.* The diagnosis continued to be acute exacerbation of COPD. *Id.* Rainwater was discharged with prescriptions. *Id.* Rainwater's asthma symptoms were improved at the time of her December 2, 2002, and December 16, 2002, follow-up appointments at OSU Medical Clinic. (R. 177-79). She had discolored patches and skin lesions that were diagnosed as mycosis fungoides.[2] *Id.* The doctor discussed progression of the disease and the need for "close follow-up." *Id.*

Rainwater was admitted to TRMC on April 27, 2003 for right chest and shoulder pain, cough, sputum, and shortness of breath. (R. 121-37). She described stabbing pain on deep inhalation. *Id.* Rainwater reported nausea and extreme pain with bowel movements. *Id.* Physical examination revealed Rainwater had decreased breath sounds of her right lung. *Id.* Exam of her skin showed plaque-like lesions on her back, abdomen, chest, and thigh. *Id.* Impressions from scans and bronchoscopy reported progressive increase of right middle lobe pneumonia/atelectasis, continued presence of a right pleural paraenchymal nodule, and posterior nodule. *Id.* Rainwater was discharged on April 30, 2003 with improvement of chest pain and shortness of breath. *Id.*

On October 19, 2003, Rainwater arrived TRMC ER with pain in the area of her armpits and shoulders, constant chest pressure, acute shortness of breath, sweats, and numbness to her lips. (R. 238-56). Chest images showed that Rainwater had a paraspinal soft tissue density mass. *Id.* Rainwater was admitted to the hospital for evaluation of cardiac symptoms. *Id.* Subsequent tests and evaluations were unremarkable. *Id.* Doctors diagnosed her with probable

---

[2] Mycosis fungoides is defined as "[a] rare, poorly understood, malignant, cutaneous T-cell lymphoma." Taber's Cyclopedic Medical Dictionary 1258 (17th ed. 1993).

musculoskeletal acute chest pain that they considered to be noncardiogenic; cutaneous T-cell lymphoma; mediastinal soft tissue mass; and asthma. *Id.* After her discharge on October 20, 2003, she returned in the evening with what was determined to be an allergic reaction. *Id.* She was provided medications and released. *Id.*

Rainwater was seen for follow-up at OSU Medical Clinic on November 10, 2003. (R.172). The physician raised the possibility of whether the results of the CT scans taken at the hospital would show an increase of the size of Rainwater's pulmonary nodule or if there were new lesions. *Id.* Rainwater was prescribed a nicotine patch to assist her to quit smoking. *Id.* During Rainwater's follow-up at OSU Medical Clinic on November 24, 2003, new skin lesions were observed. (R. 170). Referral was made for Rainwater to see an oncologist for further evaluation of symptoms, including the possible increased size of her pulmonary nodule. *Id.*

Jihad Khattab, M.D. of Oklahoma Oncology evaluated Rainwater on December 3, 2003. (R. 155-56). Rainwater reported that she first observed skin abnormalities in1986. (R. 155). She stated she received PUVA[3] treatments for diagnosed cutaneous T-cell lymphoma from approximately 1998 to 2001. *Id.* Dr. Khattab's physical examination observed dry scaly-appearing patches on Rainwater's skin. (R. 156). Rainwater underwent blood testing and scans to further evaluate lymphoma. *Id.* Dr. Khattab assessed Rainwater with cutaneous T-cell lymphoma. *Id.*

Rainwater was seen at TRMC ER on December 11, 2003 for a rash and hives accompanied by complaints of severe abdominal, chest, and back pain. (R. 236-37). Rainwater

---

[3]PUVA therapy is a "[t]herapy of psoriasis by use of psoralen and high-intensity long-wave ultraviolet light." Taber's Cyclopedic Medical Dictionary 1645 (17th ed. 1993).

advised that the onset of the symptoms occurred after an earlier CT with contrast dye scan. *Id.*
Hospital notes reflect Rainwater was not in waiting room when called approximately two hours later. *Id.*

During Rainwater's December 24, 2003 follow-up appointment with Dr. Khattab of Oklahoma Oncology, he advised her that the results of her blood tests revealed reactive lymphocyte without malignant cells. (R. 154). CT scans showed the right paraspinal mass had remained unchanged from previous scans. *Id.* Dr. Khattab examination of Rainwater's skin again noted lesions. *Id.* He concluded Rainwater needed evaluation by a dermatologist, as well as the opinion of a radiologist for further study of the paraspinal mass. *Id.*

Rainwater saw Dr. Khattab for follow-up on February 19, 2004. (R. 153). Dr. Khattab's examination of Rainwater found no new lesions and no change to existing lesions. *Id.* He informed her that the consulting radiologist confirmed the mass looked benign and needed no further intervention. *Id.* Rainwater reported that she was awaiting health insurance before she could visit a dermatologist or have new scans. *Id.* She was to return in four months. *Id.*

Complaints of shortness of breath and flu symptoms brought Rainwater to TRMC ER on March 3, 2004. (R. 231-35). Rainwater left without evaluation when her name was called approximately 2 hours after her arrival. *Id.*

Rainwater presented again to TRMC ER with shortness of breath, body aches, chills, and pains on March 9, 2005. (R. 228-29). Notes reflect she did not respond when called for evaluation. *Id.*

Rainwater arrived at TRMC ER on August 4, 2005 for pain associated with left shoulder nodule and rash. (R. 222-27). She reported an eight-month onset of symptoms and increase in the size of the shoulder nodule. *Id.* Doctors believed the symptoms were related to her T-cell

lymphoma.  *Id*.  She was discharged with a prescription.  *Id.*

Montgomery Roberts, D.O, of Houston Parke Internal Medicine, evaluated Rainwater on August 10, 2005.  (R. 167-68).  Dr. Roberts noted multiple areas of plaque like rash with scaling on Rainwater's skin.  *Id.*  Rainwater reported an increase in the number and size of the skin lesions.  *Id*.  She also reported she felt bad, experienced fatigue, and had loss of appetite.  *Id.* She advised she had not had PUVA therapy for two years due to lack of income.  *Id.*  Dr. Roberts diagnosed Rainwater with malignant lymphomas, unspecified site; and tobacco use disorder.  *Id.*  Dr. Roberts planned to contact Rainwater's oncologist and to research a medical indigent program to assist her.  *Id*.

Dr. Jihad Khattab with Oklahoma Oncology evaluated Rainwater on January 24, 2006. (R. 152).  Rainwater said that lack of health insurance coverage had prevented her from seeing him since 2004.  *Id*.  She reported recent onset of increased nausea, vomiting, unintentional weight loss, and severe fatigue. *Id*.  She also had occasional swelling of her cervical lymph nodes. *Id.*  There was a 16-pound weight loss since Rainwater was seen in 2004.  *Id.*  There was an area of soft tissue swelling in the left upper back.  *Id*.  Dr. Khattab noted Rainwater's skin lesions were unchanged.  *Id.*  Dr. Khattab planned to assist Rainwater's ability to undergo scans and biopsy of her bone marrow.  *Id.*

On February 2, 2006 Rainwater was admitted to Saint Francis Hospital for a bone marrow aspiration, bone marrow core biopsy, and various CT scans.  (R. 138-49).  On March 3, 2006, Dr. Khattab advised Rainwater that her restaging studies and bone marrow biopsy results were negative.  (R. 151).  The continued presence of a 1 cm right lung nodule was noted.  *Id.* Rainwater reported pain associated with the suprascapular mass "at times," and she stated that she was fatigued.  *Id.*  Dr. Khattab made a diagnosis of cutaneous T-cell lymphoma with possible

soft tissue mass. *Id.* He remarked on the need for an MRI of the thorax and possible need for a fine needle aspiration, and he said that oral or intravenous chemotherapy might be offered to Rainwater. *Id.*

On March 29, 2006, Dr. Khattab informed Rainwater that additional studies determined she had cutaneous T-cell lymphoma, without confirmation of systemic disease. (R. 150). The studies found Rainwater had some soft tissue fullness, and Dr. Khattab wanted a fine needle aspiration of the area. *Id.* If that was negative, Dr. Khattab wanted Rainwater to proceed with treatment by dermatology. *Id.*

Rainwater presented to the TRMC ER on May 29, 2006 with difficulty breathing and painful left shoulder mass. (R. 215-20). She was treated with breathing treatments for acute exacerbation of asthma. *Id.* She was discharged with pain medications and Albuterol. *Id.* Rainwater returned on June 9, 2006 to TRMC ER for continued breathing difficulty and flu symptoms. (R. 209-14). X-rays determined the existence of mild right lower lobe atelectasis. *Id.* Doctors treated her for bronchitis with Prednisone, Albuterol, and Lortab. *Id.*

On October 17, 2006, Rainwater presented to the TRMC ER with shortness of breath, cough, body aches, and leg pain. (R. 202-08). Examination revealed she had pharyngeal erythema. *Id.* Chest x-rays revealed mild hyperinflation of her lungs, as well as mild kyphosis and slight scoliosis of her thoracic spine. *Id.* She was treated with Levaquin and Ibuprofen for an upper respiratory infection. *Id.* Rainwater returned to TRMC's ER on October 20, 2006 with lower abdominal pain and nausea. (R. 196-201). Rainwater's symptoms were diagnosed as a urinary tract infection. *Id.*

Scott Hendrickson, D.O., with Houston Parke Internal Medicine saw Rainwater on November 6, 2006 for complaints of feeling ill, fatigue, loss of appetite, and increased number of

skin lesions. (R. 164-65). Rainwater said that the number of her lesions had doubled and that they had increased in size. *Id.* In addition, she reported lumps on top of her skin, rashes on her body, itching, and abnormal pigmentation, as well as swelling of her right anterior neck lymph gland. *Id.* Lack of health insurance and money kept her from medical treatment for years. *Id.* Dr. Hendrickson's physical examination revealed a right-sided, small, non-tender, mobile neck lymph node. *Id.* His examination also found that Rainwater had multiple skin areas of plaque like rash with scaling. *Id.* Dr. Hendrickson concluded Rainwater suffered malignant lymphomas, unspecified site; tobacco abuse; non-dependent tobacco disorder; and depression, unspecified. *Id.* It was Dr. Hendrickson's plan to treat Rainwater with medications, communicate with her oncologist, and find her a program for indigent assistance. *Id.*

Pain from a shingles rash brought Rainwater to the TRMC ER on December 14, 2006, and again on December 23, 2006. (R. 183-95). She was released on both dates with medications. *Id.*

On October 12, 2007 Rainwater presented to the emergency room at the OSU Medical Clinic for shortness of breath, cough, wheeze, and insomnia. (R. 307-14). She reported a history of bronchitis and COPD. *Id.* The doctor diagnosed her with pneumonia and acute exacerbation of COPD. *Id.* Rainwater returned to the emergency room at the OSU Medical Clinic on October 17, 2007 with increased breathing difficulty. (R. 300-06). She had labored breathing, wheezing, and dyspnea. *Id.* Rainwater's breathing improved with administration of oxygen, Albuterol, and Atrovent. *Id.* She had continued diagnoses of pneumonia, acute exacerbation of COPD, and tobacco abuse. *Id.* On discharge the doctor included an item to "quit smoking" as part of the plan of treatment. (R. 303).

Problems breathing and flu symptoms brought Rainwater for evaluation at the OSU

Medical Clinic on March 24, 2008. (R. 322). She reported increased shortness of breath over the previous year. *Id.* Rainwater reported that symptoms of dyspnea had significantly interfered with her activities of daily living and her ability to exercise. *Id.* Doctors assessed Rainwater with COPD with asthmatic component; cutaneous T-cell lymphoma; and "tobaccoism." *Id.* She was prescribed Advair, Albuterol, and Claritin. *Id.*

On August 5, 2008, an Adult Screening Assessment was completed at Family & Children's Services where Rainwater sought treatment for complaints of depression, high anxiety, mood swings, panic attacks, racing thoughts, and insomnia. (R. 342-48). The form was completed by Carla Bradford, with no indication of her role at Family & Children's Services. The Axis I[4] diagnoses were adjustment disorder with mixed anxiety and parent-child relational problems. (R. 347). Rainwater's global assessment of functioning ("GAF")[5] was stated as 40. (R. 348).

Nonexamining agency consultant Kenneth Wainner, M.D., completed a Physical Residual Functional Capacity Assessment on September 7, 2006. (R. 271-78). He determined that Rainwater had the exertional ability to occasionally lift or carry 50 pounds, and frequently lift or carry 25 pounds. *Id.* Dr. Wainner determined Rainwater could sit, stand and/or walk for six hours at a time, and he found no restriction in her ability to push or pull. *Id.* In the section for

_____

[4]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[5]"The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" *Langley v. Barnhart*, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004), *quoting* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000).

the consultant to explain the evidence supporting his conclusions, Dr. Wainner summarized Rainwater's reported activities of daily living ("ADLs") and her treatment for her mycosis fungoides, COPD, and asthma. (R. 272-73). He said that his RFC conclusions were based on her ADLs and the objective medical evidence of her medical test results. *Id.* Dr. Wainner checked the box for a limitation in reaching in all directions, and explained that "[r]eaching overhead may be limited by old scars of 3d degree burn around neck and shoulders." (R. 274). He found no other limitations of her functional ability. (R. 273-78).

A Psychiatric Review Technique form was completed by agency nonexamining consultant Sally Varghese, M.D. on May 11, 2007. (R. 279-91). Dr. Varghese concluded that Rainwater's mental impairments were not severe. (R. 279). For the "Paragraph B Criteria,"[6] Dr. Varghese found that Rainwater had mild restriction of her ADLs, and no difficulties with maintaining social functioning or maintaining concentration, persistence, or pace. (R. 289). She found insufficient evidence regarding episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Varghese noted that there was no medical evidence regarding a diagnosis of depression and that any restrictions of Rainwater's ADLs were due to her physical problems. (R. 291).

Nonexamining agency consultant Subramaniam Krishnamurthi, M.D. completed interrogatories and a Physical Medical Source Statement on September 1, 2007. (R. 292-97).

_____

[6]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of ADLs, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

The interrogatories addressed whether Dr. Krishnamurthi's opinion was that Rainwater's impairments met a Listing, and the doctor's opinion was that they did not meet a Listing. (R. 293). In the Medical Source Statement, Dr. Krishnamurthi filled out a checklist indicating Rainwater's RFC, and he found that Rainwater could sit, stand, or walk for 1 hour at a time, and could sit for a total of 6 hours and stand or walk for a total of 2 hours in an 8-hour workday. (R. 295). He found that Rainwater could occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds. *Id.* He found no limitations in Rainwater's ability to use her feet for leg controls or her hands for grasping or fingering. (R. 296). He found that Rainwater could frequently reach and occasionally bend, squat, crawl, and climb. *Id.* He found that Rainwater had a mild restriction on exposure to marked changes in temperature and humidity and exposure to dust, fumes, and gases. *Id.*

After the first hearing, the ALJ referred Rainwater for a consultative physical examination, which was completed on May 16, 2008, by agency consultant Joseph Sutton, II, D.O. (R. 323-35). Rainwater said her general health had declined over the previous two years. (R. 323). She reported her level of physical activity declined as well due to lack of energy and fatigue. *Id.* Rainwater said that she felt depressed. (R. 325). Rainwater reported that she had the ability to drive, cook, chase her grandson, and once weekly walk around the block. (R. 324). She said that she experienced shortness of breath when she shopped, and she experienced shortness of breath and a cough on a daily basis. *Id.* Rainwater's respiratory problems were aggravated by dust and fumes. *Id.* Rainwater summarized her medical history. (R. 323-24). She reported that her medical treatment for lymphoma included chemotherapy in 1998, and participation in O.U.'s clinical trial of nitrogen mustard cream. *Id.* Dr. Sutton concluded that Rainwater suffered non-Hodgkin's lymphoma; tobacco use with some degree of COPD with

reactive airways; history of mitral valve prolapse; gastroesophageal reflux disease; burns and scars secondary to skin grafts received as a child; and depression.  (R. 325).

Dr. Sutton concluded that Rainwater could sit, stand, and/or walk for two hours at a time and for a total of 8 hours in a normal 8-hour work day.  (R. 325, 332).  Rainwater could continuously carry 5 pounds, frequently lift or carry up to 20 pounds, and occasionally lift or carry up to 50 pounds.  *Id.*  Dr. Sutton found no restriction in Rainwater's use of her feet and hands for repetitive movements.  *Id.*  Rainwater could bend, squat, crawl, climb, and reach on an occasional basis, although Dr. Sutton also stated that she might be able to do those activities on a frequent basis.  (R. 326, 333).  Dr. Sutton placed a moderate restriction on Rainwater's exposure to dust, fumes, and gases.  *Id.*  Dr. Sutton also questioned whether Rainwater needed a restriction on unprotected heights because her balance during the walking exercises was not good.  *Id.*

Also after the first hearing with the ALJ, a study of Rainwater's pulmonary function and chest x-rays were done on May 19, 2008.  (R. 336-41).  Images of her thoracic spine showed Schmorl's nodes[7] and mild hypertrophic degenerative changes.  (R. 340).  Her chest x-rays showed no acute disease.  (R. 341).

## Procedural History

On February 6, 2006, Rainwater filed an application for supplemental security income under Title XVI, 42 U.S.C. § 401 *et seq.*  (R. 70-72).  Rainwater's application was denied in its entirety initially and on reconsideration. (R. 59-61, 65-68).  A hearing before ALJ  John W. Belcher was held on April 10, 2008 in Tulsa, Oklahoma.  (R. 352-86).  A second hearing was held August 19, 2008.  (R.  387-403).  By decision dated November 5, 2008, the ALJ found that

---

[7]Schmorl's diseases is "[h]erniation of the nucleus pulposus."  Taber's Cyclopedic Medical Dictionary 1760 (17th ed. 1993).

Rainwater was not disabled at any time through the date of the decision. (R. 16-27). On May 21, 2009, the Appeals Council denied review of the ALJ's findings. (R. 5-7). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[8] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[8]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of Administrative Law Judge

The ALJ determined that at Step One, Rainwater had not engaged in any substantial gainful activity since her application date of February 6, 2006. (R. 18). At Step Two, the ALJ found that Rainwater had severe impairments of cutaneous T-cell lymphoma, COPD, and depression. *Id.* At Step Three, the ALJ found that Rainwater's impairments did not meet a Listing. (R. 18-19).

The ALJ determined that Rainwater had the RFC to:

> occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, push and/or pull consistent with lifting and carrying limitations, stand and/ or walk 2 hours in an 8 hour workday, and sit 6 hours in an 8 hour workday. [Rainwater] is "moderately" limited in reference to exposure to fumes, odors, dusts, toxins, gases, and poor ventilation above that found at ground level and is

> unable to work around unprotected heights or dangerous moving machinery. Additionally, [Rainwater] is able to perform simple tasks in a habituated work setting.

(R. 19). At Step Four, the ALJ found that Rainwater could not perform any past relevant work.

(R. 25). At Step Five, the ALJ found that there were jobs that Rainwater could perform, taking into account her age, education, work experience, and RFC. *Id*. Therefore, the ALJ found that Rainwater was not disabled from the application date of February 6, 2006 through the date of his decision. (R. 26-27).

## Review

Rainwater makes several arguments. She argues that the ALJ failed to conduct a proper hearing, including failing to call a medical expert as a witness at the hearing. She also argues that the ALJ failed to properly evaluate her pain, substituted his own medical opinion, and discounted her mental health treatment. The undersigned finds that substantial evidence supports the ALJ's decision, and the decision complies with legal requirements. Therefore, the ALJ's decision is affirmed.

## Conduct of the Hearing

Rainwater's counsel first attacks the conduct of the ALJ at the hearing, arguing that he did more lecturing than inquiring into Rainwater's impairments. Social security hearings are subject to procedural due process considerations. *Yount v. Barnhart* , 416 F.3d 1233, 1235 (10th Cir. 2005), *citing Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir.1983) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). While Rainwater's counsel lists several subjects that he argues were improper for the ALJ to inquire into during the hearing, rather than inquiring into the evidence of Rainwater's impairments, none of these complaints rises to the level of due process implications. To the contrary, Rainwater was given

two different hearings before the ALJ, totaling about 50 pages of transcript. (R. 352-403). On both occasions, Rainwater was accompanied by counsel who was given the opportunity to ask questions. (R. 379, 389-95, 402-03). Rainwater's counsel conducted questioning herself at the second hearing. (R. 389-95). Two hearings, with counsel present and given the opportunity to develop the evidence at the hearings, certainly satisfy procedural due process.

Rainwater's second contention related to the conduct of the hearing, that the ALJ should have called a medical examiner as a witness at the hearing, is factually inaccurate, in addition to being a weak legal proposition. Rainwater complains that interrogatories were submitted to the expert, stating that this is a "disfavored" method of obtaining expert opinion evidence. Presumably Rainwater refers to the interrogatory evidence of Dr. Krishnamurthi submitted in 2007. (R. 292-97). After that time, however, and after the first hearing, the ALJ ordered an actual consultative examination, which was conducted by Dr. Sutton, who submitted a complete report. (R. 323-335). It is doubtful that there would have been anything improper about relying on the interrogatory evidence of Dr. Krishnamurthi, given the "broad latitude" which the ALJ has in developing the medical evidence in a Social Security disability case. *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997). However, even if there had been anything improper about relying on answers to interrogatories, that would have been cured by the later consultative examination and report of Dr. Sutton.

Further, the undersigned finds that any issue related to the way the medical opinion evidence was presented was waived. When a claimant is represented by counsel, the ALJ can ordinarily rely on the counsel to structure and present the claimant's case. *Id.* at 1166-67. In the present case, Rainwater was attended by counsel at both hearings, and that counsel expressly stated that she did not have any objections to the evidence. (R. 355, 389). Further, there is a

"proffer letter" in the administrative file that indicates that the ALJ enclosed additional evidence, which is presumably the report of Dr. Sutton. (R. 116-17). The letter states that Rainwater could request the opportunity to question the author of the enclosed reports. (R. 116). Rainwater's attorneys responded by letter stating that they had no objection to the new evidence. (R. 118). They made no request for Dr. Sutton to attend the hearing for questioning. *Id.*

At the end of the first hearing, the ALJ mentioned some additional testing that he wanted to be conducted, but not all of the tests mentioned were done. (R. 323-41, 380-86) Rainwater argues that the ALJ should have had all of the tests of Rainwater done that he mentioned at the end of the first hearing, but again Rainwater's counsel did not object at the beginning of the second hearing that all of the mentioned tests had not been done. (R. 389). Under these circumstances, any arguments relating to the way the ALJ conducted the hearing and the way that he developed the medical evidence were waived.

**The ALJ's Analysis of Rainwater's Pain**

Rainwater's counsel repeats some of his same assertions about the ALJ's conduct of the hearing in this portion of Plaintiff's Brief (Dkt. #22, pp. 5-6), and those assertions are addressed above. He also states that the ALJ failed to do a proper pain analysis, including a *Luna* analysis. *Luna v. Bowen,* 834 F.2d 161, 164 (10th Cir. 1987). The Tenth Circuit in 2004 reviewed the *Luna* framework for proper analysis of a claimant's allegations of disabling pain. *Branum v. Barnhart*, 385 F.3d 1268, 1273-74 (10th Cir. 2004). Analysis of a claimant's evidence of pain requires a three-prong inquiry:

> (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

*Branum*, 385 F.3d at 1273.

The ALJ in the present case appears to have found that Rainwater's claims satisfied the first two prongs, because he stated that Rainwater's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (R. 21). The ALJ appeared, therefore, to focus on the third prong of the inquiry and to conclude that Rainwater was not credible in claiming that her pain was disabling.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In the present case, the ALJ reviewed the medical treating and opinion evidence in some detail. (R. 20-25). The first specific reason that the ALJ gave to support his credibility determination was that Rainwater's reported activities were not consistent with complaints of totally disabling pain and fatigue. (R. 24). As the ALJ noted in his decision, Rainwater testified that she was doing the dusting, washing dishes, cooking, and doing the laundry for the entire household while she was living with her brother. (R. 365-66). Rainwater agreed with the ALJ's characterization that she was acting as a housekeeper. *Id.* ADLs are one of the *Luna* factors that

are appropriate for an ALJ to consider in assessing a claimant's pain. *Branum*, 385 F.3d at 1273-74. Thus, the inconsistency between Rainwater's reported ADLs and her claim of total disability was one specific reason closely linked to substantial evidence that supported the ALJ's credibility assessment.

Second, the ALJ, after reviewing all of the treating evidence, concluded that Rainwater's cutaneous T-cell lymphoma was "being treated conservatively and appears to be fairly stable." (R. 25). The Tenth Circuit has affirmed credibility assessments that were partially based on the conservative treatment of the claimant's medical conditions. *See Hackett v. Barnhart,* 395 F.3d 1168, 1173 (10th Cir. 2005) (affirming credibility determination based in part on ALJ's finding that the claimant had responded to conservative treatment for pain); *Stokes v. Astrue*, 274 Fed. Appx. 675, 685-86 (10th Cir. 2008) (unpublished) (affirming credibility assessment when two of four specific reasons were based on the conservative treatment of the plaintiff's conditions). The ALJ's specific reason that Rainwater's cutaneous T-cell lymphoma was being conservatively treated and appeared to be stable was closely linked to substantial evidence, and this was another legitimate factor supporting the ALJ's credibility assessment.

As a third factor, the ALJ found that Rainwater's overall history of seeking treatment was inconsistent, and he noted that Rainwater waited until shortly before the first hearing to seek mental health counseling. (R. 25). Rainwater's failure to be consistent in seeking treatment for conditions that she contended were disabling was a legitimate point for the ALJ to make in his credibility assessment. *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000).

The undersigned affirms the ALJ's credibility assessment in spite of Rainwater's continued objection to the frequent references the ALJ made during the hearings to Rainwater's smoking and to the ALJ's reliance on Rainwater's smoking as contrary to her complaints of

disabling problems with breathing. Plaintiff's Brief, Dkt. #22, pp. 2-8. The undersigned addressed above Rainwater's issues regarding the conduct of the hearing. The ALJ was entitled to consider whether Rainwater was compliant with her medical treatment. *See, e.g., Romero v. Astrue*, 242 Fed. Appx. 536, 543 (10th Cir. 2007) (unpublished) (credibility affirmed when substantial evidence supported the ALJ's credibility determination based in part on the claimant's non-compliance with medical advice). Moreover, as was true of the Tenth Circuit in *Cowan v. Astrue*, 552 F.3d 1182, 1191 (10th Cir. 2008), this Court does not have to reach the issue of Rainwater's smoking in relation to her credibility. The three specific legitimate factors discussed above were linked to substantial evidence, and they support the ALJ's credibility assessment.

**Improper Substitution of ALJ's Opinion**

In many ways, this argument is repetitive of Rainwater's argument that the ALJ improperly conducted the hearing by focusing inordinately on Rainwater's history of smoking. Plaintiff's Brief, Dkt. #22, pp. 7-8. Rainwater starts this portion of the brief by stating that the ALJ cannot substitute his own opinion for medical opinion, and she then goes on to cite to many instances in the transcript. Again, the argument related to the conduct of the hearing has been fully addressed above in this Order. Rainwater's citations to the transcript do not advance her argument that the ALJ substituted his lay opinion for medical opinion. Rainwater does go on to give a few examples from the ALJ's decision in which she contends that the ALJ misstated the medical evidence. In one instance, the ALJ said that Dr. Wainner, a nonexamining consultant had referred to a statement that there had been no weight loss. (R. 22, 272). Instead of citing to Dr. Wainner's report, which is what the ALJ cited, Rainwater cites to a page of the treating records where the physician, Dr. Khattab said there was no significant weight loss, and

Rainwater emphasizes the word "significant."  (R. 151).  The ALJ's decision accurately reflected Dr. Wainner's summary, and if Dr. Wainner omitted the word "significant" that does not mean that the ALJ improperly substituted his opinion.

Rainwater then says that the ALJ was misleading in his discussion of Rainwater's smoking, objecting to the following language of the decision:

> [The ALJ] acknowledges that [Rainwater] testified at the August 19, 2008 hearing that she was "no longer smoking" and was now "eating candy," however, the record indicates if this is true, this is a recent event in that on May 21, 2008, when seen by Dr. Sutton, the claimant admitted to "smoking for many years."

(R. 24).  Rainwater says that this is false and there was no admission because Dr. Sutton's report actually says that Rainwater "smoked for many years."  The minor difference between "smoking for many years" and "smoked for many years" has no significance in this case when Rainwater's own testimony was that she smoked up until one month before the first hearing in April 2008. (R. 363, 367, 394).  Thus, the main thrust of the ALJ's point is correct:  Rainwater's continued smoking until one month before the first hearing was inconsistent with her claim that her breathing problems were disabling.  There was no improper substitution of the ALJ's opinion in either his reference to Rainwater's weight loss or his discussion of when she stopped smoking.

**Improper Discounting of Mental Health Opinion Evidence**

Rainwater asserts that the ALJ improperly discounted the medical record from Family & Children's Services.  The only evidence from Family & Children's Services was an Adult Screening Assessment dated August 5, 2008.  (R. 342-48).  Rainwater admits that this form was apparently not signed by a medical source.  Plaintiff's Brief, Dkt. #22, p. 9.  Rainwater objects to the ALJ's discussion of this evidence:

> Also, in reference to depression, [Rainwater] admitted at the time of the hearing, that she only recently sought treatment at Family and Children's Services and she

stated she would not begin "medication" until the day following the hearing.

> [The ALJ] gives little weight to the records submitted from Family and Children's Services [], as the records do not appear to be from a medical source. Also, [the ALJ] finds that this "assessment" was only two weeks prior to the hearing, and with a GAF of 40, the claimant should have required hospitalization. Specifically, in reference to depression, it appears the claimant's alleged depression is situational in that her problems seem to be related to "children relationships" and economic distress in that her husband is unemployed.

(R. 25).

The Tenth Circuit explained the requirements of an ALJ in relationship to opinion evidence from an "other source" in *Frantz v. Astrue*, 509 F.3d 1299, 1300-01 (10th Cir. 2007). In *Frantz*, the claimant was diagnosed with bipolar disorder, and the Tenth Circuit found that the ALJ did not properly consider opinion evidence from a clinical nurse specialist who had indicated that the claimant could not work due to numerous symptoms of her mental illness. *Id.* While the nurse was not an "acceptable medical source," she was an "other source," and the ALJ was required to discuss her opinion evidence and to describe the weight he gave to that evidence. In addition, the Tenth Circuit found that the ALJ's discussion was impermissibly selective, because he discussed those portions of the nurse's evidence that supported a finding of nondisability while ignoring evidence in favor of the claimant. *Id.* at 1302, *citing Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

In the present case, the ALJ's discussion was not selective, and he explained that he gave the assessment "little weight." Rainwater states that the ALJ found her depression to be "only" situational, implying that he was belittling her claim in an impermissible way, but the ALJ did not use the word "only" in describing her depression as situational. The Family & Children's Services assessment itself says that the onset of symptoms was when Rainwater's mother-in-law

died, and in listing Axis IV problems,[9] it stated that Rainwater had severe economic and occupational problems. (R. 347-48). The assessment lists adjustment disorder with mixed anxiety and parent-child relational problems as the two diagnoses, with no mention of depression. (R. 347). All of this supports the ALJ's characterization of Rainwater's depression as situational. Given the remainder of the form, the ALJ understandably questioned the GAF assessment of 40, which the Tenth Circuit has said is "extremely low." *Salazar v. Barnhart*, 468 F.3d 615, 624 (10th Cir. 2006). The ALJ's wording that such a low score "should have required hospitalization" was not an impermissible substitution of his medical opinion, but was an imperfect way of expressing his skepticism at the assigning of such a low score. The Tenth Circuit has also noted that a GAF of 40 may indicate problems that do not necessarily relate to the ability to hold a job and therefore the score by itself is not evidence of a disabling impairment. *Lopez v. Barnhart*, 78 Fed. Appx. 675, 677-78 (10th Cir. 2003) (unpublished). Because the ALJ fairly summarized the evidence of the Family & Children's Services assessment, and explained the weight that he gave to the assessment, his discussion was adequate, and it complied with legal requirements.

---

[9]Axis IV "refers to psychosocial and environmental problems." *Schwarz v. Barnhart*, 70 Fed. Appx. 512, 516 n.1 (10th Cir. 2003) (unpublished).

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 21st day of January, 2011.

Paul J. Cleary
United States Magistrate Judge